**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| L.W., <br><br> Plaintiff, <br><br> v. <br><br> JERSEY CITY BOARD OF EDUCATION, ET AL., <br><br> Defendants. | Civ. No. 17-6451 (SDW)(LDW) <br><br><br> **OPINION** <br><br><br> July 23, 2018 |

**WIGENTON**, District Judge.

Before the Court are Plaintiff L.W.'s Motion for Summary Judgment and Defendant Jersey City Board of Education's ("JCBE")[1] Cross-Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **DENIES** the parties' motions and **REMANDS** this matter to the Administrative Law Judge for proceedings consistent with this Opinion.

**I.    BACKGROUND**

This matter comes before this Court on Plaintiff's appeal of the decision of the Administrative Law Judge ("ALJ") holding that Plaintiff's claim that JCBE denied her a

---

[1] This suit was originally brought against both JCBE and the Parsippany-Troy Hills Board of Education ("Parsippany"). (Dkt. No. 1.) Plaintiff settled with Parsippany on May 16, 2018 and Parsippany was terminated as a party on May 17, 2018. (Dkt. No. 18, 27-4 n.2.)

1

free appropriate education in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, is time-barred.[2] (*See* Pa1-16.)[3] Before turning to the merits of the motions, this Court first provides a brief overview of the IDEA to put the factual record in context.

The IDEA was enacted to ensure that children with disabilities receive an appropriate public education and are not simply warehoused "in regular classrooms awaiting the time when they were old enough to 'drop out.'" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982) (discussing the history of the IDEA) (internal citations omitted).[4] "The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate these children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) (citing *P.P. ex rel. Michael P. v. W. Chester Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)). Under this rubric, local education agencies ("LEA") are required to (1) identify children in need of special education services, and (2) provide them with a free appropriate public education ("FAPE"). *See, D.K.*, 696 F.3d at 244; *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 391 (3d Cir. 1996) (citing 20 U.S.C. § 1400(c)).

---

[2] In her due process petition below, L.W. also alleged that JCBE violated her rights under Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. The Administrative Law Judge declined to address those claims (Pa3 n.1), therefore, they are not properly before this Court and will not be addressed in this Opinion.

[3] Citations to "Pa" refer to documents contained in the Plaintiff's Appendix, which include the ALJ's decision. (Dkt. No. 27-5, 27-6.)

[4] In passing the Act, Congress found that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1).

2

A FAPE "consists of educational instruction specially designed to meet the unique needs of the . . . child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 264 (3d Cir. 2003) (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 756 (3d Cir. 1995)); *see also Rowley*, 458 U.S. at 188-89, 203-04 (instructing that, at a minimum, "if the child is being educated in the regular classrooms of the public education system," a FAPE "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade"); *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004) (discussing FAPE requirements and citing 20 U.S.C. § 1401(8)); *see also I.K. o/b/o Z.S. v. Montclair Bd. of Educ.*, Civ. No. 16-9152, 2018 WL 2441761, at *1 (D.N.J. May 31, 2018).

States provide FAPEs by means of an "individualized education program" ("IEP").[5] *See* 20 U.S.C. § 1414(d); *Shore Reg'l*, 381 F.3d at 198. An IEP must, among other things, identify a child's current performance, include short-term and long-term goals, and set out services to be provided. *Id; see also* 20 U.S.C. § 1414(d). Under New Jersey law, the IEP is developed by a child study team ("CST")[6] along with "parents, a teacher familiar with the students, and other personnel." *Shore Reg'l*, 381 F.3d at 198-99, 264-65; *see also* Rowley, 458 U.S. at 182 (requiring that the IEP be "prepared at a meeting between a qualified representative of the [LEA], the child's teacher, the child's parents or guardian, and where appropriate, the child."); *see also Ridley Sch. Dist. v. M.R.*, 680 F.3d

---

[5] An IEP is defined as "a written statement for each child with a disability that is developed, reviewed, and revised[.]" 20 U.S.C. § 1401(15).

[6] The CST is composed of "a psychologist, a learning disability teacher-consultant, and a school social worker." *Shore Reg'l*, 381 F.3d at 198-99 (citing N.J.S.A. § 18A:46-5.1). The CST first evaluates the student to determine if he or she should be classified as disabled, and if the student is deemed disabled, that evaluation is used to help develop the IEP. *Id.* (citing N.J.S.A. § 6A:14-3.1, § 6A:14-3.7).

260, 269 (3d Cir. 2012) (noting that "[t]he core of the IDEA is the collaborative process that it establishes between parents and schools"). "[T]he education provided must 'be sufficient to confer some educational benefit'" upon the student. *T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577-78 (3d Cir. 2000) (internal citations omitted) (noting that an appropriate IEP "must provide 'significant learning' and confer 'meaningful benefit' as 'gauged in relation to a child's potential'").

## II.   FACTUAL AND PROCEDURAL HISTORY

Plaintiff L.W.[7] was born on May 12, 1994, and at all times relevant to this matter, resided in Jersey City, New Jersey. (Pa232, 113.) L.W. is cognitively impaired and never finished high school. (Pa4, 74-75, 167-71.) L.W.'s mother, H.W., and father, E.P., struggle with alcohol and drug addiction, and H.W. has been diagnosed with schizophrenia. (Pa21, 29, 67, 146-52, 254-55, 258, 278-79.) As a result of his addictions, E.P. was frequently absent from the home. (Pa67.)[8] Both parents have been the subject of investigations by law enforcement and the child welfare system. (*See, e.g.*, Pa134, 223-24, 225-26, 233-34.) The Division of Youth and Family Services ("DYFS")[9] had open cases involving L.W. and her siblings from October 1991 through April 2002 and then

---

[7] Although the Plaintiff is now an adult, as is common in cases such as this, she is identified only by her initials, and certain information is redacted throughout the filings, ostensibly to shield her identity and protect her personal and confidential information. *See e.g.*, *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712 (3d Cir. 2010); *Paul G. v. Monterey Peninsula Unified School Dist.*, Civ. No. 16-5582, 2018 WL 2763302 (N.D. Cal. June 8, 2018). Sloppy and inconsistent redactions in the Plaintiff's Appendix, however, reveal not only Plaintiff's, but also her parents', full names and addresses. Plaintiff's counsel is cautioned to exercise greater care in the future.

[8] Although the ALJ questioned the credibility of L.W.'s certification in this matter due to her cognitive impairments, (Pa.6), this Court finds no basis to doubt L.W.'s recollection of her family life. Because the ALJ did not hear testimony in this matter, this Court need not defer to any credibility determinations. *See Shore Reg'l*, 381 F.3d at 199 (noting that "special weight" is given to an ALJ's credibility determinations where the ALJ has "heard live testimony").

[9] DYFS was renamed the Division of Child Protection and Permanency ("DCPP") on June 29, 2012. L. 2011, c. 16, eff. June 29, 2012 (amending N.J.S.A. 9:3A-10(b)). For purposes of this opinion, this Court uses DYFS to refer to the Division.

again from September 2006 through September 2010. (Pa278-280.) Given the dysfunction and chaotic nature of L.W.'s family life, the persons or entities having legal and/or physical custody over L.W. changed throughout her minority. On December 9, 1999, the New Jersey Superior Court granted L.W.'s parents joint physical and legal custody, but vested E.P. with "full responsibility and right of administration to enroll, continue the children in school and any medical attention needed for the children." (Pa227-28.) On December 20, 2007, a subsequent order from the Superior Court instructed that L.W. and her siblings "continue under the custody, care and supervision of the Division" with "legal custody transferred to the Division" and physical custody to H.W. (Pa253-55, 257.)[10] In that same order, E.P. was forbidden to live in the family home or to visit the children "until he enter[ed] a drug treatment program." (*Id.*) Six months later, on May 8, 2008, the Superior Court continued the Division's "care and supervision," but also "continued" legal and physical custody with H.W. (Pa256-58.)[11]

L.W. was enrolled in the Jersey City Public School system in 1999 as a kindergarten student. (Pa74-75.) During her time in public school, L.W. repeated the first, fourth, and eighth grades, and was referred for evaluation for special education three times. (*Id.*, Pa79-106, 107-13, 124-39.) L.W. was initially referred by her first grade teacher on February 5, 2001. (Pa79-106.) E.P. consented to the evaluation and L.W. was tested between February and May, 2001, but was found ineligible for special education services on June 14, 2001. (*Id.*)

---

[10] The record does not include any documents relating to DYFS's involvement with L.W. or her family between late 1999 through December 2007, other than to note that DYFS opened a new case for L.W. in September 2006.

[11] It is unclear how legal custody "continued" to H.W., as the prior order had given DYFS legal custody. It is also unclear which persons or entities maintained responsibility and right to enroll/continue children in school at this time. *See* Pa253-55.

On January 26, 2007, concerned about L.W.'s academic achievement and classroom behavior, L.W.'s fifth grade teacher referred her for evaluation for the second time. (Pa107-113.) The school attempted to contact E.P., but he did not appear for an evaluation meeting scheduled for February 13, 2007. (Pa114-121.) E.P. also did not appear when the meeting was rescheduled for February 26, 2007. (*Id.*) The record does not indicate whether E.P. received any notices from the school, and attempts by DYFS to locate him were unsuccessful. (Pa120-21.) L.W.'s case was closed "due to parental non-compliance" and L.W. was not evaluated. (Pa120.) Despite L.W.'s teacher's concerns, L.W. was promoted directly from fifth to eighth grade. (Pa159.) Because L.W. was frequently absent, she was placed on home instruction for her eighth grade year. (Pa131, 159.)

In 2008, DYFS sought to have L.W. referred for evaluation for a third time. (Pa124-39.) In May of that year, DYFS requested that L.W. be provided with specialized placement and given home instruction to address educational deficiencies and bullying/verbal harassment. (Pa258-61.) Attempts by the school to contact E.P. were again unsuccessful.[12] Case notes dated June 24, 2008 indicate that E.P. did not have a phone and school personnel from Jersey City Public Schools asked DYFS to contact him to inform him of the meeting. (Pa127, 135-37.) The referral was closed after the school could not obtain parental consent. (*Id.*) In October, DYFS again asked that L.W. be evaluated for special education services. (Pa138-39.) At that time, the Supervisor of Special Education

---

[12] On June 25, 2008, a written notice was allegedly sent to E.P. to inform him of a meeting that same day to discuss "referral for special education evaluation and, if warranted, evaluation planning." (Pa124.) A second letter dated June 25, 2008, was also allegedly sent to E.P. to notify him that the school "proposes to evaluate your child for eligibility for Special Education and Related Services. This determination was made as the result of your participation in an evaluation planning meeting held on 6/25/08." (Pa127.) There is no indication in the record that E.P. received the initial notification letter or attended the meeting.

6

indicated "parent of this student does not have any interest in pursuing services . . . [and] has not given consent to any personnel in the school or in the Programs or Services Department to pursue this effort. Instead, the parent has verbally agreed to meet with appropriate personnel to give consent for the Child Study Team evaluation." (Pa141.) The record does not specify which "parent" the Supervisor was referring to, nor what communications led to this conclusion. On October 27, 2008, the school held a meeting with H.W. and school personnel during which H.W. consented to have L.W. evaluated. (Pa142-45.) The results of the evaluation indicated that L.W. has an IQ of 78 and was "low average" or "borderline" in all areas of functioning, and "would need special education support with accommodations and modifications in order to pass the demands of a general education curriculum." (Pa167-171.)

An eligibility meeting was scheduled for January 3, 2009, but H.W. did not attend. (Pa173-76, 216.) School personnel again closed the case because they could not obtain parental consent. (Pa181-87, 216-19.) L.W. continued on one hour a day homebound instruction for the remainder of the 2008-09 school year and was promoted to the ninth grade in June 2009. (Pa69.) During her ninth grade year, it appears that L.W. did not receive any home instruction, despite her desire that it continue. (*Id*.) L.W. was disenrolled from the district on May 13, 2010 due to excessive absences. (Pa78.)

Six years later, Plaintiff filed a due process petition with the Office of Special Education Programs on December 19, 2016. (Pa17-42) The petition was sent to the Office of Administrative Law ("OAL") on January 20, 2017. (Pa3.) After failed attempts at settlement, the parties filed cross-motions for summary decision in early 2017. (*Id.*) ALJ Ellen S. Bass ("ALJ Bass") held oral argument on the motions, but did not hold a due

process hearing before issuing her decision on May 30, 2017. The Opinion granted Defendant JCBE's motion and denied Plaintiff's motion on statute of limitation grounds. (Pa1-16.) On August 27, 2017, Plaintiff filed a Complaint in this Court, appealing ALJ Bass's decision. (Dkt. No. 1.) The parties filed cross-motions for summary judgment, which were fully briefed on May 22, 2018. (Dkt. No. 27, 30, 33, 34, 40.)

## III.   LEGAL STANDARD

Under New Jersey law, the "process for resolving disputes arising in special education cases starts with mediation." *S.H.*, 336 F.3d at 266 (citing N.J.A.C. § 1:6A-4.1). "If mediation fails, the case is forwarded to the Office of Administrative Law and assigned" to an ALJ. *Id.*; *see also D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 472 (D.N.J. 1997) (citing *Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.*, 116 N.J. 30, 39 (1989)). Once an ALJ makes a determination, any party has the right to appeal directly to the New Jersey Superior Court or a federal district court. *Id.* The reviewing court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §§ 1415(i)(2)(C)(i)-(iii).

Although the district court will conduct an independent review of the case, "due weight" must be given to the factual findings of the administrative agency. *D.B.*, 985 F. Supp. at 472; *see also Rowley*, 458 U.S. at 206. The Third Circuit has interpreted the due weight requirement to be a "modified de novo review." *S.H.*, 336 F.3d at 270. Under the "modified de novo review," the district court must give "due weight and deference to the findings in the administrative proceedings." *D.K.*, 696 F.3d at 243. If the reviewing court

disagrees with the administrative agency's factual findings, it must give an explanation as to why. *Id.* "[T]he court must explain why it does not accept the ALJ's findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." *S.H.*, 336 F.3d at 270. In addition, if the reviewing court finds factual conclusions contrary to that of the ALJ's without hearing any additional evidence, it must point to evidence in the record before it for support. *Id.* Review of the ALJ's "application of legal standards and conclusions of law" including the statutes of limitation "are subject to plenary review." *Janek ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014). Where the ALJ has "heard live testimony," its credibility determinations are given "special weight." *Shore Reg'l*, 381 F.3d at 199. "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial extrinsic evidence in the record would *justify* a contrary conclusion.'" *Id.* (emphasis in original).

## IV. DISCUSSION

ALJ Bass dismissed Plaintiff's due process petition as time-barred by the IDEA's two-year statute of limitations. (Pa1-16.) The "IDEA statute of limitations requires a parent to request a due process hearing within two years of 'the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint.'" *D.K.*, 696 F.3d at 244 (citing 20 U.S.C. § 1415(f)(3)(C) and 34 C.F.R. § 300.511(e)); *see also G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 626 (3d Cir. 2015) (holding that "absent one of the two statutory exceptions found in § 1415(f)(3)(D),[13] parents have

---

[13] The statute does not apply
> to a parent if the parent was prevented from requesting the hearing due to--
> **(i)** specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

9

two years from the date they knew or should have known of the violations to request a due process hearing through the filing of an administrative complaint . . .").

Because an "IDEA claim accrues when the parent 'knew or should have known' about the claim . . . determining whether a particular claim is time-barred is necessarily a fact-specific inquiry." *K.H. v. New York City Dep't of Educ.*, No. 12-CV-1680, 2014 WL 3866430, at *16 (E.D.N.Y. Aug. 6, 2014). The first step in that inquiry is to identify the "parent" with authority to assert a child's rights. Here, the task is difficult because the persons holding legal authority to make educational decisions for L.W. (and, consequently, to challenge her classification) changed over time. (Pa253-55.) For example, in 1999, H.W. and E.P. shared legal and physical custody of L.W., but E.P. was given sole authority to make educational decisions for L.W. (*Id.*) There is no order in the record that revokes that authority. Later orders from the New Jersey Superior Court suggest that, during different periods, DYFS or H.W. had legal custody of L.W. (without clarifying what legal rights or responsibilities E.P. had).[14] Unfortunately, gaps in the record fail to explain exactly how and when those transitions occurred or what effect they had on prior orders. As a result, although H.W. was invited to participate in L.W.'s evaluation process in 2009, it is not clear from the record that she could have legally consented to the evaluation. Although she is L.W.'s biological mother, a biological parent is not an IDEA parent if they do not have "legal authority to made educational decisions for the child" or where "a judicial decree or order identifies a specific person . . . to make educational decisions on

---

        **(ii)** the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.
20 U.S.C.A. § 1415(f)(3)(D).

[14] ALJ Bass's opinion recognizes these shifts, without addressing the issues of fact they create. (*See* Pa10-11 (referring to E.P., H.W., and DYFS as having the ability to assert claims on L.W.'s behalf).)

10

behalf of a child." 34 C.F.R. 30(b)(1)-(2).  As a result, there is a genuine issue of material fact as to who was authorized to advocate for L.W.'s IDEA rights while she was enrolled in the Jersey City public schools.

The second part of the inquiry requires a determination as to when a parent "knew or should have known" about an IDEA claim.  Assuming for the purposes of this motion that L.W.'s parents had legal authority to assert her rights, their mental health and addiction issues and the chaotic nature of their lives raise questions as to whether 1) they were aware of the evaluation process, and 2) they were capable of advocating for her.  Because ALJ Bass did not hold a due process hearing, the record contains no testimony from L.W., either of her parents, the DYFS case worker, L.W.'s law guardian, or any school personnel. Instead, the record consists solely of documentary evidence that fails to answer basic and preliminary questions regarding what L.W.'s parents knew at any given point in time.  The record is unclear as to whether written or telephonic notices of meetings were received and if parental absences from required meetings were intentional. At the time in question, E.P. did not appear to have a working phone and was abusing drugs and alcohol. He was at times forbidden from residing in the family home and there is no confirmation in the record that he received mailed notices.  On at least one occasion, H.W. did not sign meeting confirmation forms.  (*See* Pa184.)  Given these existing issues of fact, summary judgment is inappropriate at this juncture.  The parties' cross-motions for summary judgment will be denied and this matter remanded with instructions to hold a due process hearing to address all issues raised in this Opinion and pertinent to Plaintiff's claims.

## V. CONCLUSION

For the reasons stated above, the parties' cross-motions for summary judgment are **DENIED** and this matter **REMANDED** to the Administrative Law Judge for a due process hearing.

>    /s/ Susan D. Wigenton
> **SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
Cc:    Leda D. Wettre, U.S.M.J.
       Parties